UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| CENTRAL MAINE | ) | |
| MEDICAL CENTER, | ) | |
| | ) | |
|       *Plaintiff* | ) | |
| | ) | |
| v. | ) | Civil No. 07-42-P-S |
| | ) | |
| MICHAEL O. LEAVITT, | ) | |
| Secretary of the United States | ) | |
| Department of Health | ) | |
| and Human Services, | ) | |
| | ) | |
|       *Defendant* | ) | |

## RECOMMENDED DECISION ON CROSS-MOTIONS
## FOR JUDGMENT ON ADMINISTRATIVE RECORD

Central Maine Medical Center ("CMMC") and Michael O. Leavitt, secretary of the United States Department of Health and Human Services ("Secretary" of "HHS") cross-move for judgment on the administrative record in this case challenging a final decision of the Secretary (via the Administrator of the Centers for Medicare & Medicaid Services ("CMS")) to deny CMMC's request for an adjustment in Medicare reimbursement to reflect its payment of a tax assessed on Maine hospitals in fiscal years 1996, 1997 and 1998. *See generally* Plaintiff's Motion for Judgment Based on the Administrative Record, etc. ("Plaintiff's Motion") (Docket No. 12); Defendant's Motion for Judgment Based on the Administrative Record, etc. ("Defendant's Motion") (Docket No. 13). For the reasons that follow, I recommend that the Secretary's motion for judgment on the administrative record be granted and that of CMMC be denied.

## I.  Applicable Legal Standards

CMMC invokes 42 U.S.C. § 1395oo(f), *see* Plaintiff's Motion at 10, which provides for judicial review of the Secretary's decisions in accordance with the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, *see* 42 U.S.C. § 1395oo(f)(1); *P.I.A. Sarasota Palms, Inc. v. Shalala*, 125 F. Supp.2d 1085, 1087 (M.D. Fla. 2000).

Pursuant to the APA, "[a]n inquiring court can set aside an agency's adjudicatory decisions only if those decisions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or unsupported by substantial evidence in the administrative record." *South Shore Hosp., Inc. v. Thompson*, 308 F.3d 91, 97 (1st Cir. 2002) (citations and internal quotation marks omitted). An agency's interpretation of its own regulations "must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation[.]" *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (citation and internal quotation marks omitted). "This broad deference is all the more warranted when . . . the regulation concerns a complex and highly technical regulatory program, in which the identification and classification of relevant criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns." *Id*. (citation and internal quotation marks omitted). "The burden is on the party challenging the Secretary's reasoning to show that it fails to pass muster under the reasonableness standard." *South Shore*, 308 F.3d at 101.

By cross-moving for judgment based on the administrative record filed in this case, the parties empower the court to adjudicate this case based on that record, resolving any factual as well as legal disputes. *See, e.g., Brotherhood of Locomotive Eng'rs v. Springfield Terminal Ry. Co*., 210 F.3d 18, 31 (1st Cir. 2000) ("In a case submitted for judgment on a stipulated record, the district court resolves disputed issues of material fact.") (citation omitted).

2

## II. Regulatory Backdrop

1.  Medicare is a national program of health insurance for the aged and disabled established by enactment of the Medicare Act in 1965. *See, e.g., Telecare Corp. v. Leavitt,* 409 F.3d 1345, 1346 (Fed. Cir. 2005); *Jordan Hosp., Inc. v. Shalala*, 276 F.3d 72, 74 n.1 (1st Cir. 2002). Congress has charged the Secretary with responsibility for administering Medicare and has authorized him to issue regulations and interpretive rules implementing its governing statutes. *See, e.g.,* 42 U.S.C. §§ 405(a), 1395hh(a). The Secretary, in turn, has delegated these responsibilities to the Administrator of CMS. *See, e.g., United States v. White*, 492 F.3d 380, 387 (6th Cir. 2007). CMS contracts with private insurance companies, referred to as fiscal intermediaries, to perform various functions under the program, including determining amounts due to providers of services and making payments to them. *See, e.g.*, 42 U.S.C. § 1395h; 42 C.F.R. § 421.100; *White*, 492 F.3d at 387.

2.  Historically, Medicare reimbursed hospitals on the basis of the "reasonable cost" of services provided to program beneficiaries. *See, e.g., Battle Creek Health Sys. v. Leavitt,* 498 F.3d 401, 403 (6th Cir. 2007); *Wayne County Gen. Hosp. v. Leavitt*, 470 F. Supp.2d 775, 779 (E.D. Mich. 2007).

3.  With passage of the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), Congress modified the reasonable-cost-reimbursement methodology to create incentives for providers to render services more efficiently and economically. *See, e.g., Sarasota Palms*, 125 F. Supp.2d at 1088. TEFRA imposed a ceiling on the rate of increase in Medicare reimbursement for hospitals' inpatient operating costs by calculating the allowable amount of such costs for a hospital's "base period" and, for subsequent years, "applying a rate-of-increase or update factor to the target amount of the base period." *Id.*; *see also* 42 C.F.R. § 413.40(b)(1) & (c)(3). Providers were subject to reduction in reimbursement if their operating costs exceeded a particular year's target amount;

3

conversely, they were eligible for bonuses if their operating costs fell below that amount. *See, e.g., CHW West Bay v. Thompson,* 246 F.3d 1218, 1221 (9th Cir. 2001); *Sarasota Palms*, 125 F. Supp.2d at 1088; *see also* 42 C.F.R. § 413.40(d).

    4.    Congress directed the Secretary to provide for exceptions, adjustments and exemptions to TEFRA target amounts in certain circumstances. *See, e.g.,* 42 U.S.C. § 1395ww(b)(4)(A); *St. Francis Med. Ctr. v. Shalala*, 32 F.3d 805, 806 (3d Cir. 1994). The governing statute provides, in relevant part:

> The Secretary shall provide for an exception and adjustment to . . . the method under this subsection for determining the amount of payment to a hospital where events beyond the hospital's control or extraordinary circumstances, including changes in the case mix of such hospital, create a distortion in the increase in costs for a cost reporting period (including any distortion in the costs for the base period against which such increase is measured).

42 U.S.C. § 1395ww(b)(4)(A)(i). In a separate subsection, Congress also directed:

> In the case of any hospital which becomes subject to the taxes under section 3111 of the Internal Revenue Code of 1986 [Federal Insurance Contribution Act, or "FICA," taxes], with respect to any or all of its employees, for part or all of a cost reporting period, and was not subject to such taxes with respect to any or all of its employees for all or part of the 12-month base cost reporting period referred to in subsection (b)(3)(A)(i) of this section, the Secretary shall provide for an adjustment by increasing the base period amount described in such subsection for such hospital by an amount equal to the amount of such taxes which would have been paid or accrued by such hospital for such base period if such hospital had been subject to such taxes for all of such base period with respect to all its employees, minus the amount of any such taxes actually paid or accrued for such base period.

*Id*. § 1395ww(b)(6).

    5.    CMS promulgated regulations implementing the foregoing provisions, which provide, in relevant part:

> (g) Adjustments –
>
> (1) General rules.

4

(i) CMS adjusts the amount of the operating costs considered in establishing the rate-of-increase ceiling for one or more cost reporting periods, including both periods subject to the ceiling and the hospital's base period, under the circumstances specified in paragraphs (g)(2), (g)(3), and (g)(4) of this section.

(ii) When the hospital requests an adjustment, CMS makes an adjustment only to the extent that the hospital's operating costs are reasonable, attributable to the circumstances specified separately, identified by the hospital, and verified by the intermediary.

(iii) When the hospital requests an adjustment, CMS makes an adjustment only if the hospital's operating costs exceed the rate-of-increase ceiling imposed under this section.

***

(2) Extraordinary circumstances. CMS may make an adjustment to take into account unusual costs (in either a cost reporting period subject to the ceiling or the hospital's base period) due to extraordinary circumstances beyond the hospital's control. These circumstances include, but are not limited to, strikes, fire, earthquakes, floods, or similar unusual occurrences with substantial cost effects.

(3) Comparability of cost reporting periods –

(i) Adjustment for distortion. CMS may make an adjustment to take into account factors that would result in a significant distortion in the operating costs of inpatient hospital services between the base year and the cost reporting period subject to the limits.

(ii) Factors. The adjustments described in paragraph (g)(3)(i) of this section, include, but are not limited to, adjustments to take into account:

> (A) FICA taxes (if the hospital did not incur costs for FICA taxes in its base period).
> 
> (B) Services billed under part B of Medicare during the base period, but paid under part A during the subject cost reporting period.
> 
> (C) Malpractice insurance costs (if malpractice costs were not included in the base year operating costs).
> 
> (D) Increases in service intensity or length of stay attributable to changes in the type of patient served.

    (E) A change in the inpatient hospital services that a hospital provides, and that are customarily provided directly by similar hospitals, such as an addition or discontinuation of services or treatment programs.

    (F) The manipulation of discharges to increase reimbursement.

42 C.F.R. § 413.40(g).

  6. In addition, CMS addressed the question of TEFRA adjustments in its Provider Reimbursement Manual ("PRM"), stating, in a section titled "Adjustments to Rate of Increase Ceiling":

> Due to a variety of circumstances, inpatient operating costs of a hospital or unit could exceed the ceiling in one or more cost reporting periods. If these excess costs are reasonable, justified, and directly related to patient care services, the provider may request an adjustment to the payment allowed under the rate of increase ceiling. . . . The premise underlying the rate of increase ceiling is that inpatient operating costs remain comparable from year to year absent any significant change in services or patient population. Changes in the type of patients served or in patient care services that distort the comparability of a cost reporting period to the base year are grounds for an adjustment request. A hospital may request an adjustment to the payment allowed under the rate of increase ceiling in situations where there is a distortion in a hospital's operating costs in either its base period or a cost reporting period subject to the ceiling. HCFA makes such an adjustment at the hospital's request only under the following conditions:
>
>   ○ The hospital's allowable inpatient operating costs exceed the ceiling;
>
>   ○ The excess costs are related to direct patient care services;
>
>   ○ The excess costs are attributable to the circumstances specified;
>
>   ○ The excess costs are separately identified by the hospital;
>
>   ○ The excess costs are verified by the intermediary; and
>
>   ○ The excess costs are determined to be reasonable.

PRM § 3004, *reprinted in* Record at 1508.

  7. A hospital may appeal a fiscal intermediary's denial of its adjustment request to the Provider Reimbursement Review Board ("PRRB"), provided certain jurisdictional requirements are

6

met. *See, e.g.,* 42 U.S.C. § 1395oo; 42 C.F.R. § 413.40(e)(4). The PRRB's decision in the appeal is final unless the Secretary, acting through the Administrator of CMS, reverses, affirms or modifies the decision within sixty days. *See, e.g.*, 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1875(g). A facility may obtain judicial review of any "final decision" of the PRRB or the Administrator. *See, e.g.*, 42 U.S.C. § 1395oo(f)(1).

8. In 1991 the Maine legislature enacted a tax on Maine hospitals known as the Maine Hospital Tax ("Tax"), formerly codified at 36 M.R.S.A. § 2801-A. *See* Historical and Statutory Notes to 36 M.R.S.A. § 2801-A. This legislation imposed a tax on Maine hospitals equal to six percent of each hospital's "final gross patient service revenue limit as established by the Maine Health Care Finance Commission or, on or after January 1, 1996, by the Department of Human Services." *See* former 36 M.R.S.A. § 2801-A(1) (1995). The Tax was repealed in 1998. *See id.* § 2801-A(10).

### III. Proposed Findings of Fact

1. CMMC, located in Lewiston, Maine, is a non-profit, general acute-care teaching hospital duly certified as a provider of services under the Medicare program. *See* Complaint for Judicial Review Pursuant to 42 U.S.C. § 1395oo(f) ("Complaint") (Docket No. 1) ¶ 6; Defendant's Answer ("Answer") (Docket No. 7) ¶ 6.

2. CMMC's complex includes a twelve-bed rehabilitation unit ("Unit") that qualifies as a "distinct part unit" under the Medicare Act and regulations promulgated thereunder. *See id.* ¶ 23. The Unit is subject to the TEFRA target amount. *See id.* For purposes of TEFRA, CMMC's base year is the fiscal year ending June 30, 1985. *See* Record at 5.

3. CMMC requested adjustments to TEFRA limits for the Unit for fiscal years 1996, 1997 and 1998. *See id.* at 1535, 2293-94, 4468-69. It alleges that the Tax resulted in increased costs to the Unit of $99,975 in fiscal year 1996, $112,168 in fiscal year 1997 and $123,102 in fiscal year 1998.

*See id*. at 34-35.  On its Medicare cost reports, CMMC reported the Tax as an expense in its "Administrative and General" cost center.  *See id*. at 5394; *see also, e.g., id*. at 5236.

    4.    CMMC's fiscal intermediary, Associated Hospital Service, denied those adjustment requests.  *See, e.g., id*. at 25-26.  The fiscal intermediary had denied similar requests by CMMC for adjustments to the Unit's TEFRA target amounts on account of payment of the Tax in fiscal years 1993, 1994 and 1995; however, CMMC appealed those decisions and prevailed by virtue of a favorable decision of the PRRB dated April 23, 2003.  *See Provider – Cent. Me. Med. Ctr. v. Intermediary – Blue Cross Blue Shield Ass'n/Associated Hosp. Serv*., No. 2003-D22, 2003 WL 21010672 (PRRB Apr. 24, 2003).  The Administrator of CMS took no action on the April 23, 2003 decision.  *See* Record at 35.

    5.    As CMMC had in the case of denial of its TEFRA adjustment requests for fiscal years 1993, 1994 and 1995, it appealed denial of its adjustment requests for fiscal years 1996, 1997 and 1998 to the PRRB.  *See id*. at 26.  Prior to the PRRB's ruling, the parties stipulated that they had resolved all issues save that of the Tax.  *See id.* at 6509.  The PRRB again ruled in CMMC's favor, holding by decision dated November 14, 2006 that CMMC was entitled to the requested adjustment on account of payment of the Tax for all three years in question.  *See id*. at 30.  The PRRB found denial of CMMC's request for an adjustment improper inasmuch as:

> A.    "[T]here is no dispute regarding the nature of the subject hospital tax as an allowable cost.  That is, Maine's hospital revenue tax is recognized as a reimbursable cost by the Medicare program."  *Id*. at 28.
>
> B.    The Tax was "clearly an 'event beyond the hospital's control' that created a distortion between its base period costs and the costs of the affected reporting periods."  *Id.* at 28-29.  The Tax was "imposed by the State, and the Provider [was] required to pay it."  *Id*. at 29.
>
> C.    A section of the relevant regulation, 42 C.F.R. § 413.40(g)(3), specifically mentioned FICA taxes as a factor warranting adjustment.  *See id*.  There was "no reason for the subject Maine hospital tax to be treated any differently than

FICA taxes." *Id*. In addition, the listing containing FICA taxes was meant to be illustrative rather than all-inclusive. *See id*. In a similar case, *Tenet HealthSys. Hosps., Inc. v. Shalala*, 43 F. Supp.2d 1334 (M.D. Fla. 1999), the court so found with respect to a mandatory revenue tax imposed on hospitals by the state of Florida. *See id*.

   D.   An argument by the intermediary that the Tax should not be considered a factor warranting adjustment because it was essentially a mechanism for the state to enhance revenues through federal matching funds was rejected. *See id.* CMS failed to amend its regulations and guidelines to reflect its position that adjustment for such taxes was unwarranted, although it had been aware that providers were seeking such adjustments as early as 1991. *See id*. at 30.

6.   On or about November 30, 2006 the Administrator of CMS gave notice that he had decided on his own motion to review the decision of the PRRB. *See id*. at 18-19. By decision dated January 12, 2007, the Secretary (via the Acting Deputy Administrator of CMS) reversed the decision of the PRRB. *See id*. at 2-12. The Secretary acknowledged that the Tax, first imposed in 1991, was not included in CMMC's base year. *See id*. at 8. However, he determined that, regardless whether the Tax would have been allowable had it been imposed in 1985, CMMC fell short of meeting criteria for an adjustment or exception inasmuch as:

   A.   Imposition of the tax did not constitute an "extraordinary circumstance" as set forth in 42 C.F.R. § 413.40(g)(2). *See id*. "While the State tax may be 'beyond the hospital's control,' it is in no way an 'unusual occurrence.' Unlike the list of extraordinary circumstances in the regulation, fluctuations in State taxes are to be expected. [CMMC] in this case has not disputed that it had advance notice of the State tax." *Id*. (footnote omitted).

   B.   On any of three grounds, the Tax did not qualify for a "significant distortion" adjustment: (i) the Tax was distinguishable in several respects from FICA; (ii) the Tax was not related to direct patient-care services – a prerequisite for a TEFRA adjustment pursuant to PRM § 3004; and (iii) even assuming *arguendo* that overhead costs, such as state-tax payments, ever could provide the basis for a "significant distortion" adjustment, CMMC had not demonstrated that the tax payments in issue caused a "significant" distortion in operating costs or that the costs were reasonable, attributable to the circumstances specified and separately identified. *See id*. at 9-11.

9

### IV. Proposed Conclusions of Law

1. CMMC argues, in the main, that the Secretary's denial of the instant adjustment requests contravened the plain language of the governing statute and regulation, which mandated that the requests be granted. *See* Plaintiff's Motion at 11-14. It also asserts that the Secretary erred in concluding that (i) it failed to demonstrate that the Tax was the cause of costs in excess of its ceiling or of a "significant distortion" pursuant to 42 C.F.R. § 413.40(g)(3), and (ii) imposition of the Tax did not qualify as an "extraordinary circumstance" pursuant to 42 C.F.R. § 413.40(g)(2). *See id*. at 14-18.

2. The Secretary counters that the governing statute does not clearly mandate grant of the requests in issue; hence, the question is whether denial of those requests was reasonable. *See* Defendant's Motion at 8. He argues that it was. *See id*. at 8-14.

3. As CMMC recognizes, *see* Plaintiff's Motion at 11-12, its argument implicates the two-step analysis outlined in *Chevron U.S.A. Inc. v Natural Res. Def. Council, Inc*., 467 U.S. 837 (1984):

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron*, 467 U.S. at 842-43 (footnotes omitted). "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id*. at 843 n.11.

4.      In this case, the precise question presented is whether the Secretary must grant a TEFRA cost adjustment for payment of a state tax assessed on gross patient-service revenues. Congress explicitly mandated, in a separate subsection of the governing statute, that the Secretary make adjustments for hospitals that become subject subsequent to their base years to "taxes under section 3111 of the Internal Revenue Code of 1986" – in other words, FICA taxes.  *See* 42 U.S.C. § 1395ww(b)(6); 26 U.S.C. § 3111.  However, Congress did not directly speak to the question whether TEFRA adjustments must be made to account for assessment of other types of taxes.  *See* 42 U.S.C. § 1395ww(b)(4).  The statute accordingly is silent on that issue.

5.      CMMC nonetheless suggests that the statute on its face makes plain the Secretary has no discretion not to grant the requested adjustments.  *See* Plaintiff's Motion at 12-14.  Yet the statute's general language – mandating TEFRA adjustments to account for "events beyond the hospital's control" or "extraordinary circumstances" that "create a distortion in the increase in costs for a cost reporting period[,]" 42 U.S.C. § 1395ww(b)(4)(A)(i) – does not unambiguously mandate grant of the requests in question.  Those key phrases are undefined, *see id.* § 1395ww(b), and neither party suggests that legislative history offers enlightenment as to their meaning, *see* Plaintiff's Motion at 11-14; Defendant's Motion at 6-8.  The Secretary has acknowledged that imposition of the Tax represented an event "beyond the hospital's control[.]"  Record at 8.  However, it is unclear from the face of the statute whether assessment of a new state tax qualifies as an "extraordinary circumstance" or whether its payment, in any and all circumstances, necessarily "create[s] a distortion in the increase in costs for a cost reporting period[.]"  Pursuant to *Chevron*, the question presented thus is whether the Secretary's denial of the instant adjustment requests was based on a permissible construction of the statute.

11

6.      The Secretary denied CMMC's adjustment requests on grounds that payment and/or imposition of the Tax in fiscal years 1996, 1997 and 1998 qualified for neither the "significant distortion" nor "extraordinary circumstances" adjustments outlined in 42 C.F.R. § 413.40(g). *See* Record at 8-11.

7.      The Secretary permissibly deemed assessment of the Tax not to constitute an "extraordinary circumstance." As noted above, the governing statute does not define the phrase "extraordinary circumstances." *See* 42 U.S.C. § 1395ww(b)(4)(A)(i). The relevant section of the regulations – the validity of which CMMC does not challenge, *see* Plaintiff's Motion at 17-18 – provides:

> CMS may make an adjustment to take into account unusual costs (in either a cost reporting period subject to the ceiling or the hospital's base period) due to extraordinary circumstances beyond the hospital's control. These circumstances include, but are not limited to, strikes, fire, earthquakes, floods, or similar unusual occurrences with substantial cost effects.

42 C.F.R. § 413.40(g)(2). The Secretary reasoned: "While the State tax may be 'beyond the hospital's control,' it is in no way an 'unusual occurrence.' Unlike the list of extraordinary circumstances in the regulation, fluctuations in State taxes are to be expected. The Provider in this case has not disputed that it had advance notice of the State tax." Record at 8. In so doing, the Secretary rationally distinguished imposition of taxes from the class of sudden, unexpected occurrences – such as strikes and acts of God – described in the regulation. CMMC – which argues weakly that the listed events are merely illustrative and conclusorily that imposition of the Tax represented an extraordinary circumstance that it could not anticipate, *see* Plaintiff's Motion at 17-18, does not meet its burden of demonstrating that the Secretary's reasoning "fails to pass muster under the reasonableness standard." *South Shore*, 308 F.3d at 101; *see also, e.g., Harmaville Rehab. Ctr., Inc. v. Shalala*, 93-1943 (WBB), 1995 WL 599189, at *5 (D.D.C. July 21, 1995), *aff'd*, 107 F.3d 922

(D.C. Cir. 1996) ("The Defendant interprets the phrase 'extraordinary circumstances' in § 405.463(g) [predecessor to 42 C.F.R. § 413.40(g)(2)] to allow the granting of an exception only when a provider has experienced a 'highly unusual occurrence[] of a severe, sudden, and unexpected nature . . ., i.e., an occurrence as catastrophic as those specifically mentioned in the regulation. The Court cannot characterize this rather literal construction as a 'plainly erroneous' reading of the language of the regulation.") (footnote omitted).

        8.       I turn to the question whether the Secretary permissibly denied CMMC a "significant distortion" adjustment. The Secretary enumerated three grounds for that denial, concluding that:

        A.       Although 42 C.F.R. § 413.40(g)(3)(ii) specifically lists assessment of FICA taxes among examples of events warranting adjustment, there are notable differences between the Tax and FICA: one is federal and the other state; Congress specifically recognized an adjustment for payment of FICA taxes; and the FICA tax provides beneficiaries with senior and survivor's benefits, whereas the Maine Hospital Tax "appears to be representative of those types of taxes imposed by States to increase Medical Federal financial participation and frequently resulting in hospitals receiving 'rebates.'" Record at 9.

        B.       CMS consistently has taken the position – reflected in section 3004 of the PRM – that adjustments will be made only for operating costs related to direct patient-care services. *See id*. The PRM expressly excludes overhead costs as a basis for adjustment. *See id*. That position is reasonable, consistent with the intent of the TEFRA limitations and within the authority and discretion of the agency to impose. *See id*.

        C.       Even assuming *arguendo* that overhead costs such as a state tax could ever provide a basis for adjustment under section 413.40(g)(3), CMMC failed for several reasons to demonstrate that the tax caused costs in excess of its ceiling, or a significant distortion of its costs, in the relevant years. *See id*. at 10-11. For example, during the years in question, CMMC experienced a significant decrease in utilization and length of stay but failed to explain what, if anything it had done to cut costs in response. *See id*. Per PRM § 3004.2, a decline in utilization is not a basis for an adjustment; a provider is expected to decrease its costs accordingly. *See id*. at 11.

        9.       In its papers, CMMC took issue with the first and third bases for denial of the "significant distortion" adjustment but did not directly address the second. *See* Plaintiff's Motion at 10-18; *see also generally* Plaintiff's Reply and Opposition to Defendant's Cross Motion for Judgment

Based on the Administrative Record ("Plaintiff's Reply") (Docket No. 15).[1] I convened a telephone conference with counsel (held on January 18, 2008) to elicit CMMC's views on that basis for denial of its request. Counsel for CMMC explained that he thought he had addressed that point in his papers but, in any event, he considered it a non-issue inasmuch as the PRRB, in both its 2003 ruling and in the instant ruling, recognized that there was no dispute that the Tax was an allowable cost. Beyond that, he argued, the Tax, which was assessed on patient-care revenues, clearly is related to patient-care services. In response, counsel for the Secretary took issue with the notion that the PRRB had determined, in the rulings cited by his opponent, that payment of the Tax was related to direct patient-care services. He also argued that the Secretary reasonably had (i) construed the governing statute to limit TEFRA adjustments to costs related to direct patient-care services and (ii) deemed payment of the Tax an overhead cost rather than a cost related to direct patient-care services.

10. The Secretary has the better of this argument. As a threshold matter, CMMC articulates no challenge to the reasonableness of the Secretary's interpretation of the governing statute and regulation, embodied in PRM § 3004, that a cost must be related to direct patient care – rather than classifiable as overhead – to qualify for a TEFRA adjustment.[2] Rather, it argues that the PRRB recognized that there was no dispute that payment of the Tax so qualified and, in any event, it is clear that it does.

11. The PRRB decisions cannot reasonably be read as conveying that there was no dispute that the Tax was related to direct patient care for purposes of PRM § 3004. In both decisions, the

---

[1] Counsel indirectly addressed the point in arguing that the governing statute and regulation left no discretion for the Secretary to deny the requested adjustments. *See, e.g.*, Plaintiff's Motion at 11-14.

[2] "[P]ronouncements in manuals like the PRM, which do not have the force of law, are entitled to less deference than an interpretation arrived at after a formal adjudication or notice-and-comment rulemaking." *Visiting Nurse Ass'n Gregoria Auffant, Inc. v. Thompson*, 447 F.3d 68, 73 (1st Cir. 2006). Nonetheless, such pronouncements have survived challenge when they represent reasonable interpretations, not in conflict with the governing statutes and regulations. *See, e.g., Shalala v. Guernsey Memorial Hosp.*, 514 U.S. 87, 99-102 (1995).

14

PRRB stated: "[T]here is no dispute regarding the nature of the subject hospital tax as an allowable cost. That is, Maine's hospital revenue tax is recognized as a reimbursable cost by the Medicare program." *CMMC*, 2003 WL 21010672, at *6; Record at 28. Nonetheless, the PRRB acknowledged in both instances that the Secretary did in fact dispute that the Tax, which he considered overhead, was directly related to patient-care services for purposes of a TEFRA adjustment. *CMMC*, 2003 WL 21010672, at *4; Record at 27. Inasmuch as appears, what was undisputed was that payment of the Tax would have been allowable had CMMC's costs been within the TEFRA target amount. *See, e.g.*, Record at 5391 (section in fiscal intermediary's position paper quoting, and agreeing with, position of CMS that "had the provider's costs, including taxes, been within the TEFRA target amount, Medicare would indeed have reimbursed the hospital for the taxes"). However, the Secretary (via CMS) and the fiscal intermediary made clear that, in their view, a request for an adjustment over and above the TEFRA target amount constituted a whole new ballgame, implicating a different set of rules. *See, e.g., id*. (section of fiscal intermediary's position paper quoting, and agreeing with, position of CMS that "the manual instructions (Provider Reimbursement Manual, Part 1, Section 3004) specify that the costs in excess of the ceiling must be 'directly related to patient care services' to be considered for adjustment purposes, and obviously, that is not the case in this situation"). In any event, even if the PRRB did mean to suggest that it was undisputed that the tax was related to direct patient-care services for purposes of PRM § 3004, its opinion is neither binding on this court nor persuasive. The Secretary has consistently disputed this point, including in its papers filed with this court and during the January 18, 2008 teleconference with counsel. *See, e.g.*, Defendant's Motion at 9-10.

  12. The question remains whether the Secretary supportably determined that, for purposes of application of PRM § 3004, the Tax constituted an overhead cost rather than a cost related to direct patient-care services. I conclude that he did. As an initial matter, CMMC itself reported the Tax

payment as an expense in its Administrative & General cost center that increased costs significantly in every area of the hospital, including the Unit. *See, e.g*., Record at 5236, 5394. That is the essence of an "overhead" cost. *See, e.g*., Black's Law Dictionary 1103 (6th ed. 1990) (defining "overhead," *inter alia*, as "[a]ll administrative or executive costs incident to the management, supervision, or conduct of the capital outlay, or business; distinguished from 'operating charges,' or those items that are inseparably connected with the productive end and may be seen as the work progresses, and are the subject of knowledge from observation. . . . [G]eneral expenditures in financial or industrial enterprises which cannot be attributed to any one department or product[.]").

13. Second, while the Tax was perhaps loosely related to patient care in the sense that it was assessed on patient-care-service revenues, it was not a cost of providing direct patient care such as the cost of employee wages, medical equipment and hospital supplies. *See* PRM § 3004.1, *reprinted in* Record at 1516 (contrasting increase in nursing services caused by higher medical acuity in patient population, which merits TEFRA adjustment, with allocation of increased overhead costs to TEFRA unit, which does not). While it is true, as CMMC underscores, that Congress has directed that an adjustment be made in the case of payment of FICA taxes, *see* Plaintiff's Motion at 17; Plaintiff's Reply at 3-4, it does not necessarily follow that the Tax must be viewed as related to direct patient-care services. As the Secretary points out, FICA tax is paid on employee wages. *See* Defendant's Motion at 9; *Sarasota Mem'l Hosp. v. Shalala*, 60 F.3d 1507, 1512 (11th Cir. 1995) ("[E]mployer-paid employee FICA taxes are included in the definition of wages for purposes of federal income taxes."). The Tax, by contrast, was assessed against hospitals' gross patient-care-services revenues.[3] It was not a cost incurred to provide patient care.

---

[3] CMMC relies in part on two cases in which the United States District Court for the Middle District of Florida overturned decisions of the Secretary denying TEFRA adjustments for payment of a Florida state tax, the Florida Indigent Care Tax ("FICT"), which was assessed on providers' net operating revenues. *See* Plaintiff's Motion at 13-16; Plaintiff's Reply at 2-6; *Sarasota Palms*, 125 (*continued on next page*)

16

14. Inasmuch as (i) the governing statute, 42 U.S.C. § 1395ww(b)(4)(A)(i), does not clearly and unambiguously mandate that CMMC's requested adjustments for payment of the Tax in fiscal 1996, 1997 and 1998 be granted, and (ii) the Secretary articulated reasonable bases for concluding that imposition and/or payment of the Tax did not qualify for either an "extraordinary circumstance" adjustment or a "significant distortion" adjustment pursuant to 42 C.F.R. § 413.40(g)(2) and (3), the decision of the Secretary must be affirmed.[4]

## V. Conclusion

For the foregoing reasons, I recommend that the Secretary's motion for judgment on the administrative record be **GRANTED** and that of CMMC be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 21st day of February, 2008.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge

---

F.Supp.2d at 1089 & n.2, 1092; *Tenet*, 43 F.Supp.2d at 1342-43. These cases are materially distinguishable inasmuch as no issue was raised concerning whether the FICT was related to direct patient-care services for purposes of PRM § 3004. *See Sarasota Palms*, 125 F. Supp.2d at 1089-92; *Tenet*, 43 F. Supp.2d at 1341-43.

[4] While the Secretary articulated three independent bases for denial of the "significant distortion" adjustment, *see* Record at 9-11, the finding that one of those three bases was reasonable is dispositive of the instant appeal. I need not and do not reach the question whether the remaining two bases pass muster.